WEBER, LEICHT, GOHR & ASSOCIATES, Plaintiff-Respondent,†

v.

LIBERTY BANK and Kansas Bankers Surety Company, Defendants-Appellants.

Court of Appeals

*No. 99–1557. Oral argument September 20, 2000.—Decided October 10, 2000.*

### 2000 WI App 249

(Also reported in 620 N.W.2d 472.)

†Petition to review denied.

461

On behalf of the defendants-appellants, the cause was submitted on the briefs of *Victor E. Plantinga* of *Rose & DeJong,* of Brookfield, and *Alan V. Johnson* and *Martha A. Peterson* of *Sloan, Listrom, Eisenbarth, Sloan & Glassman, L.L.C.,* of Topeka, Kansas. There was oral argument by *Alan V. Johnson.*

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Jeffrey P. Aiken* and *Mary C. McManus* of *Whyte Hirschboeck Dudek S.C.,* of Milwaukee. There was oral argument by *Mary C. McManus.*

An amicus curiae brief was filed by *John E.* Knight and *James E. Bartzen* of *Boardman, Suhr, Curry & Field LLP,* of Madison, for The Wisconsin Bankers Association.

Before Wedemeyer, P.J., Fine and Schudson, JJ.

¶ 1. FINE, J. Liberty Bank and Kansas Bankers Surety Company appeal from a judgment entered on a jury verdict awarding Weber, Leicht, Gohr & Associates some $66,000 plus costs. Liberty and Kansas

Bankers contend that the Uniform Commercial Code as adopted in Wisconsin bars the judgment.[1] We agree.

## I.

¶ 2. Weber is an advertising agency that suffered significant embezzlement by one of its employees, who forged and altered the company's checks. The total loss was a little more than $120,000.

¶ 3. Weber had a checking account with Liberty. Weber sued Liberty under various legal theories, claiming in essence that Liberty was responsible for the loss because Liberty did not discover the forgeries or alterations. Among the legal theories Weber asserted against Liberty was strict-liability misrepresentation—claiming that Liberty represented falsely to Weber that it would examine each of the checks drawn on Weber's account and compare the signatures on the checks with the signatures provided by Weber to Liberty on the bank's signature cards. The jury found against Weber on all of its claims but the one asserting strict-liability misrepresentation, finding, as material to that claim, that:

- Liberty made "a representation of fact . . . that it would compare all checks drawn on [Weber]'s account against the signature card to determine if such checks were properly authorized prior to payment";

- Liberty's representation was "untrue";

---

[1] Judgment was only entered against Liberty Bank. Accordingly, all issues that were raised before the trial court in connection with Kansas Bankers Surety Company are moot. An *amicus curia* brief was filed by the Wisconsin Bankers Association.

463

- Liberty made "the representation as a statement based on its personal knowledge or in circumstances in which it necessarily ought to have known the truth or untruth of the representation";

- Liberty had "an economic interest in the transaction which was the subject of such representation";

- Weber believed the "representation to be true and rel[ied] on it to its monetary damage"; and

- Weber "justifiably rel[ied] on the representation to its monetary damage."

These findings satisfy the elements of a strict-liability misrepresentation claim. *See Reda v. Sincaban,* 145 Wis. 2d 266, 268–269, 426 N.W.2d 100, 102 (Ct. App. 1988) (Elements of a strict-liability misrepresentation claim are "(1) that the defendant made a representation of fact; (2) that such representation of fact was untrue; (3) that the defendant made the representation as a fact based on his own personal knowledge, or in circumstances in which he necessarily ought to have known the truth or untruth of the statement; (4) that the defendant had an economic interest in the transaction; and (5) that the plaintiff believed such representation to be true and relied on it.").

## II.

¶ 4. Although the parties have spent significant efforts debating whether a claim for strict-liability misrepresentation is *per se* displaced by the provisions of the Uniform Commercial Code, and, if not, both whether a bank has a legal duty to disclose its check-handling procedures, and whether it was a question of fact for the jury to decide if Liberty voluntarily

464

assumed a duty to disclose its check-handling procedures to Weber, we do not discuss these intriguing issues because in our view any such claim is trumped by Weber's failure to comply with the responsibilities imposed on bank customers by WIS. STAT. §§ 403.406 and 404.406. *See State v. Blalock,* 150 Wis. 2d 688, 703, 442 N.W.2d 514, 520 (Ct. App. 1989) (cases should be decided on the "narrowest possible ground").

¶ 5. The parties agree that this action is governed by the Uniform Commercial Code as adopted in Wisconsin, specifically those provisions found in WIS. STAT. chs. 403 and 404 that govern the relationship between a bank and its customers. *See* WIS. STAT. §§ 403.102(1), 403.102(2), 404.102, and 404.103(1) (1997–98); *Winkie, Inc. v. Heritage Bank of Whitefish Bay,* 99 Wis. 2d 616, 622, 299 N.W.2d 829, 833 (1981).[2] As Weber argues, however, certain pre-Code remedies

---

[2] WISCONSIN STAT. § 403.102(1) & (2) (1997–98) provide:

**Subject matter. (1)** This chapter applies to negotiable instruments. It does not apply to money, to payment orders governed by ch. 410 or to securities governed by ch. 408.

  **(2)** If there is a conflict between this chapter and ch. 404 or 409, chs. 404 and 409 govern.

These subsections were amended into their present form by 1995 Wis. Act 449, § 9. The predecessor provisions, found in WIS. STAT. § 403.103 (1991–92), were substantially similar.

WISCONSIN STAT. § 404.102 (1997–98) provides:

**Applicability. (1)** The extent that items within this chapter are also within chs. 403 and 408, they are subject to those chapters. If there is conflict, this chapter governs ch. 403, but ch. 408 governs this chapter.

  **(2)** The liability of a bank for action or nonaction with respect to an item handled by it for purposes of presentment, payment or collection is governed by the law of the place where the bank is located. In the case of action or nonaction by or at a branch or separate office of a bank, its liability is governed by the law of the place where the branch or separate office is located.

survive enactment of the Code, so long as those reme-
dies do not conflict with specific Code provisions. *See*
WIS. STAT. § 401.103. Section 401.103 provides:

> Unless displaced by the particular provisions of
> chs. 401 to 411 the principles of law and equity,
> including the law merchant and the law relative to
> capacity to contract, principal and agent, estoppel,
> fraud, misrepresentation, duress, coercion, mis-
> take, bankruptcy, or other validating or
> invalidating cause shall supplement its provisions.

Weber contends that this provision preserves its strict-
liability misrepresentation claim.

¶ 6.   The checks involved in this case span two
versions of the applicable provisions of Wisconsin's ver-
sion of the Uniform Commercial Code. The changes
were effective August 1, 1996. *See* 1995 Wis. Act 449,
§§ 100, 101. Given the jury's findings, however, any
distinction here between the provisions is immaterial.
For the sake of consistency, we refer to the current
version of the provisions in the body of this opinion, and

---

This section was amended into its present form by 1995 Wis. Act
449, § 12. The predecessor provision, found in WIS. STAT.
§ 403.102 (1991–92), was substantially similar.

WISCONSIN STAT. § 404.103(1) (1997–98) provides:

**Variation by agreement; measure of damages; action consti-
tuting ordinary care. (1)**   The effect of the provisions of this
chapter may be varied by agreement, but the parties to the agree-
ment cannot disclaim a bank's responsibility for its lack of good
faith or failure to exercise ordinary care or limit the measure of
damages for the lack or failure. However, the parties may deter-
mine by agreement the standards by which the bank's
responsibility is to be measured if those standards are not mani-
festly unreasonable.

This subsection was amended into its present form by 1995 Wis.
Act 449, § 13. The predecessor provision, found in WIS. STAT.
§ 403.102 (1991–92), was substantially similar.

will place in footnotes the earlier version. WISCONSIN STAT. § 401.103 is the same today as it was before August 1, 1996.

¶ 7. WISCONSIN STAT. § 403.406 (1997–98) provides, with the part material to our analysis in italics:

> **(1)** *A person whose failure to exercise ordinary care substantially contributes to an alteration of an instrument or to the making of a forged signature on an instrument is precluded from asserting the alteration or the forgery against a person who, in good faith, pays the instrument or takes it for value or for collection.*
>
> **(2)** Under sub. (1), if the person asserting the preclusion fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss, the loss is allocated between the person precluded and the person asserting the preclusion according to the extent to which the failure of each to exercise ordinary care contributed to the loss.
>
> **(3)** Under sub. (1), the burden of proving failure to exercise ordinary care is on the person asserting the preclusion. Under sub. (2), the burden of proving failure to exercise ordinary care is on the person precluded.[3]

In connection with this provision (and its predecessor quoted in footnote 3), the jury found:

---

[3] WISCONSIN STAT. § 403.406 (1991–92) provided:

> Any person who by his or her negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business.

- Weber did not "exercise ordinary care" in connection with the forged and altered checks and that this failure "substantially contribute[d] to the alteration or forgery";

- Liberty paid the "checks in 'good faith' ";

- Liberty exercised "ordinary care in paying" the checks.

¶ 8.  WISCONSIN STAT. § 404.406(3) (1997–98) provides that if a bank makes available to its customer "a statement of account" that complies with WIS. STAT. § 404.406(1) (1997–98) showing the bank's payment of items from the customer's account, "the customer must exercise reasonable promptness in examining the statement or the items to determine whether any payment was not authorized because of an alteration of an item or because a purported signature by or on behalf of the customer was not authorized." The analogue to this provision in the pre-August 1996 version was in WIS. STAT. § 404.406(1) (1991–92), which is set out in this footnote.[4]

¶ 9.  WISCONSIN STAT. § 404.406(4) gives to the bank immunity from liability for a customer's loss if the customer does not timely examine the checks that the bank paid, so long as the bank paid the checks in good faith. This section provides, as material here:

---

[4] WISCONSIN STAT. § 404.406(1) (1991–92) provided:

When a bank sends to its customer a statement of account accompanied by items paid in good faith in support of the debit entries or holds the statement and items pursuant to a request or instructions of its customer or otherwise in a reasonable manner makes the statement and items available to the customer, the customer must exercise reasonable care and promptness to examine the statement and items to discover the customer's unauthorized signature or any alteration on an item and must notify the bank promptly after discovery thereof.

If the bank proves that the customer failed, with respect to an item, to comply with the duties imposed on the customer by sub. (3), the customer is precluded from asserting all of the following against the bank:

. . .

(b)   The customer's unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank if the payment was made before the bank received notice from the customer of the unauthorized signature or alteration and after the customer had been afforded a reasonable period of time, not exceeding 30 days, in which to examine the item or statement of account and notify the bank.

The analogue to this provision in the pre-August 1996 version was in WIS. STAT. §§ 404.406(2) & (3) (1991–92), which are set out in this footnote.[5] In connection with WIS. STAT. § 404.406 (1997–98) (and its predecessor quoted in footnotes 5 and 6), the jury found:

- Weber did not "exercise reasonable promptness in examining the corresponding bank

---

[5] WISCONSIN STAT. § 404.406(2) (1991–92) provided:

If the bank establishes that the customer failed with respect to an item to comply with the duties imposed on the customer by sub. (1) the customer is precluded from asserting against the bank:

. . .

(b)   An unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank after the first item and statement was available to the customer for a reasonable period not exceeding 14 calendar days and before the bank receives notification from the customer of any such unauthorized signature or alteration.

WISCONSIN STAT. § 404.406(3) (1991–92) provided:

The preclusion under sub. (2) does not apply if the customer establishes lack of ordinary care on the part of the bank in paying the item.

statement and canceled checks to determine whether payment was authorized";

- "Based on the bank statement and items provided," Weber should have "reasonably discovered the unauthorized payment[s]";

- Weber did not "promptly notify the Bank of the relevant facts."

- Liberty paid the "checks in 'good faith' ";

- Liberty exercised "ordinary care in paying" the checks;

¶ 10. WISCONSIN STAT. §§ 403.406 and 404.406 (1997–98) and their predecessors are, essentially, echoes of pre-Code law. *See Winkie,* 99 Wis. 2d at 623, 299 N.W.2d at 833 ("equitable principles akin to estoppel . . . have been incorporated into the Uniform Commercial Code"); *Wussow v. Badger State Bank,* 204 Wis. 467, 471–472, 234 N.W. 720, 721–722 (1931) (customer who does not timely examine bank statement may not hold liable bank that pays forged checks unless the bank is negligent in making the payment), *reh'g denied,* 204 Wis. 467, 236 N.W. 687 (1931). At oral argument, Weber conceded, as it had to, that the jury's findings were its determination that Weber did not comply with the obligations imposed by the material provisions of §§ 403.406 and 404.406 (1997–98) and their predecessors, that Liberty paid the checks in "good faith," and that there was sufficient evidence presented at the trial supporting those findings.
■

¶ 11. Under the statutes that we have examined in this opinion, and under the pre-Code law, if a customer does not timely take the reasonable precautions to protect itself, and the bank has paid the items in good faith, the customer is, in the word of the Code,

"precluded" from holding the bank liable for damages that the customer's vigilance would have prevented. *See Winkie*, 99 Wis. 2d at 626, 299 N.W.2d at 835. Stated another way, so long as the bank pays the items in "good faith," compliance with these duties by the customer is a "precondition to a customer's lawsuit against a bank." *See Borowski v. Firstar Bank Milwaukee*, 217 Wis. 2d 565, 569, 579 N.W.2d 247, 249 (Ct. App. 1998) (applying WIS. STAT. § 404.406(4) (1991–92)).

■

¶ 12.  Although framed as a misrepresentation claim, Weber seeks to hold the bank liable for paying the checks despite the "unauthorized signature or alteration." Legal analysis of a claim focuses on the essence of the alleged wrong for which a plaintiff seeks redress and not on either the name or the legal theory applied to that claim. *See Strid v. Converse*, 111 Wis. 2d 418, 423, 331 N.W.2d 350, 353 (1983) (" '[A] cause of action is not constituted by labeling the operative facts with the name of a legal theory. The operative facts themselves, if they show the invasion of a protected right, constitute the cause of action. What they are called is immaterial.' ") (quoted source omitted). Although a claim for misrepresentation may "supplement" the provisions of the Uniform Commercial Code, it may not supplant them. *See* WIS. STAT. § 401.103. Indeed, § 401.103 specifically preserves the pre-Code defense of "estoppel." Thus, irrespective of the angle at which Weber's attempt to recover against Liberty for strict-liability misrepresentations is viewed (either by applying the pre-Code law, including the estoppel principles discussed by *Winkie* and *Wussow* to "supplement" the Code, or by requiring Weber to clear the hurdle erected by §§ 403.406 and 404.406(4)

(1997–98) and their predecessors as a precondition to application of the pre-Code law), Weber cannot prevail.

*By the Court.*—Judgment reversed.